UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEAH JEANETTE DIPIPPO-BRADLEY,

     Plaintiff                              Civil Action No. 14-13167

v.                                     HON.  MARIANNE O. BATTANI
                                      U.S. District Judge
                                      HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

     Defendant.
_____/

## REPORT AND RECOMMENDATION

     Plaintiff Leah Jeanette Dipippo-Bradley ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Plaintiff's motion [Doc. #12] be GRANTED to the extent that the case is remanded for further administrative proceedings and that Defendant's motion for summary judgment [Doc. #13] be DENIED.

## PROCEDURAL HISTORY

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on September 7, 2011, alleging disability beginning February 1, 2007 (Tr. 15, 173). After the initial denial of the claim, Plaintiff requested an administrative hearing, held on March 4, 2013 before Administrative Law Judge ("ALJ") David F. Neumann in Detroit, Michigan (Tr. 29). Plaintiff, represented by attorney Patrick M. Carmody, testified (Tr. 33-52), as did vocational expert ("VE") Don K. Harrison (Tr. 52-57). On April 30, 2013, ALJ Neumann found Plaintiff not disabled (Tr. 24). On June 12, 2014, the Appeals Council denied review (Tr. 1-3). Plaintiff filed for judicial review of the final decision on August 15, 2014.

## BACKGROUND FACTS

Plaintiff, born August 10, 1958, was 54 at the time of the administrative decision (Tr. 24, 173). She completed four years of college (Tr. 190) and worked previously as an administrative assistant and a "publisher" for an advertising agency (Tr. 190). She alleges disability due to a heart valve condition, depression, anxiety, Post Traumatic Stress Disorder ("PTSD"), neck injuries, lower extremity radiculopathy, and back and foot injuries (Tr. 189).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived by herself in Harper Woods, Michigan (Tr. 33). She currently had four cats and six kittens and was also "fostering" four other cats (Tr. 33). She stood 5' 3 ½" and

-2-

weighed 180 pounds (Tr. 34). Her weight had "doubled" since 2007 (Tr. 34). She received a Bachelor's degree in communications and the arts with a double minor in sociology and journalism (Tr. 34). She did not receive Worker's Compensation, unemployment benefits, private insurance, or any other benefits (Tr. 35).

Plaintiff experienced severe chest, neck, back, left hip, left thigh, and bilateral foot pain (Tr. 35). She experienced the medication side effects of dizziness, short term memory problems, concentrational problems and stomach aches (Tr. 36). Despite earnings records showing work in 2010, she testified that she last worked in May, 2007 (Tr. 36-38).

She typically arose at 7:30 a.m. and retired at midnight (Tr. 39). Due to nighttime sleep disturbances, she customarily took a nap around noon for one hour (Tr. 39). She was able to care for her personal needs and shopped twice a week (Tr. 40). She cooked "fairly easy meals" such as pasta or salads (Tr. 40). She performed laundry chores and ran the dishwasher once a week (Tr. 40). She vacuumed once every two weeks but needed to take a break after vacuuming one room (Tr. 41). She was unable to lift a bucket (Tr. 41). She attended church once a week and if her back hurt, she remained in a kneeling position (Tr. 41). She volunteered serving meals at a senior home on Sundays and holidays (Tr. 42). She was able to take the trash to the curb once a week by dragging rather than lifting it (Tr. 42). She was unable to perform yard or gardening chores (Tr. 42). She did not watch television during the day, but followed the news on her cell phone (Tr. 43). She read the local newspapers and magazines as well as marketing and automotive-related magazines online

(Tr. 43-44).  She held a valid driver's license but was unable to drive more than 40 minutes at a time due to lower back, left hip, and leg numbness (Tr. 44).  She enjoyed watching car races (Tr. 45).

Plaintiff was unable to sit for more than 30 minutes at a time, stand for up to 15, or walk for more than "four houses in length" (Tr. 46).  She was unable to lift, carry, push, or pull more than 20 pounds (Tr. 46).  She was able to bend from the waist or squat only with difficulty (Tr. 47-48).  She was unable to kneel (Tr. 47).  She did not use recreational drugs but drank alcohol occasionally (Tr. 48).  In addition to the physical problems, Plaintiff experienced "anxiety and stress" which inhibited her from engaging in a full range of activities (Tr. 48-49).

In response to questioning by her attorney, Plaintiff testified that she took Motrin 800 two to three times a day (Tr. 49).  She reported taking Xanax and Inderal for chest pain, adding that the Xanax served the double function of quelling chest pain and reducing anxiety (Tr. 50).  She testified that the chest pain was attributable to a mitral valve prolapse which was first diagnosed in 1986 (Tr. 50).   She indicated that she took Neurontin for hip and lower extremity pain; Ambien for insomnia; and Paxil for anxiety (Tr. 50-51).

Plaintiff reported that left hip pain radiated up to her waist and down to her left knee (Tr. 52).  She testified that she had experienced the radiating pain and numbness since 2005 (Tr. 52).

**B.      Medical Evidence[1]**

**1. Records Related to Plaintiff's Treatment**

In August, 2002, Alok Shukla, M.D. opined that Plaintiff was unable to work due to "chest pain, stress, and anxiety" (Tr. 271-272). In February and March, 2003, Dr. Shukla again found that Plaintiff was unable to work due to the effects of a mitro-valve condition, chest pain, anxiety, insomnia, fatigue, and "extreme weight loss (down to 92-93 pounds)" (Tr. 247, 269-270).

In November, 2004, Michael J. Naber, M.D. noted that Plaintiff experienced stress and anxiety due to both her divorce and her mother's death (Tr. 284). September, 2006 treating records by Dr. Naber state that Plaintiff experienced "increased anxiety" (Tr. 251, 283). January, 2009 office records by Dr. Naber note that Plaintiff was "under stress" and experienced depression (Tr. 249). On February 1, 2009, Plaintiff was admitted for psychiatric inpatient treatment for an "exacerbation" of a "[l]ong history of anxiety" (Tr. 257, 292, 431). Dr. Nabor remarked that Plaintiff had "been acting strangely in the office" (Tr. 292).

The February, 2009 inpatient records state that Plaintiff was treated involuntarily on February 1, for "unspecified psychosis" (Tr. 306, 381). Dr. Nabor noted a diagnosis of "bipolar manic" (Tr. 308). He remarked that Plaintiff had been admitted for inpatient

---

[1]

Medical records significantly predating the alleged February 1, 2007 onset of disability are included for background purposes only.

psychiatric treatment 20 years earlier (Tr. 430). She was noted to have "persecutory" delusions and anxiety (Tr. 312). Treating records state that family members noted that she had been isolated since a divorce three to four years before, at which time, her former husband took out a restraining order against her (Tr. 436). They also noted that she appeared to have abused alcohol (Tr. 436-437). She was assigned a GAF of 30 to 35[2] (Tr. 434). Plaintiff denied mental illness (Tr. 313). Treating notes state that she was hospitalized after falsely telling police that she had "broken pipes" at her house and that a man (currently incarcerated) was attempting a sexual assault (Tr. 321-322). Treating notes state that Plaintiff was isolated and "grandiose in her behavior" (Tr. 326). She was prescribed Risperadol after exhibiting delusional behavior (Tr. 357, 368, 381-382, 397, 418). She was discharged on February 6 after "interacting in an appropriate, reality-based, manner with others" (Tr. 423). She was referred for outpatient treatment (Tr. 423-424).

In April, 2012 Dr. Naber discontinued his treatment relationship with Plaintiff on the basis that she had made multiple phone calls to his office "without making appointments over the last few years" (Tr. 280). In February, 2013, Psychologist Linda Lawrence noted that she saw Plaintiff "a number of times" "a long time prior to" the closing of a treating clinic in

---

[2]

A GAF score in the range of 21–30 is associated with "considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment OR inability to function in almost all areas." *Diagnostic and Statistical Manual of Mental Disorders–Text Revision*, 34 (*"DSM–IV–TR"* ) (4th ed.2000). A GAF score of 31–40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *Id.*

2009 (Tr. 301). She noted that at her last session with Plaintiff, she recommended "a complete and thorough psychological exam administered by a highly qualified psychiatrist" (Tr. 301). Dr. Lawrence noted that in the past month, Plaintiff had filled out a new "medical information form" (Tr. 301). Plaintiff stated on the form that she was the "victim of multi-crimes/theft/stalking" and discrimination, harassment, domestic violence, police brutality, civil rights violations, and "wrongful denial of bus service" (Tr. 302). She reported the conditions of anxiety, insomnia, nervousness, and worry (Tr. 304). Physical health records from the same month note a history of stress, anxiety, chest pain, and insomnia (Tr. 450).

## 2. Non-Treating Sources

In December, 2011, psychiatrist R. Hasan, M.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's report of depression due to "family loss, family stressors, and financial difficulty" (Tr. 258). She reported being "isolative and withdrawn" (Tr. 258). She denied the use of alcohol or drugs (Tr. 258). Dr. Hasan noted fair grooming with normal posture and gait with a calm mood and appropriate affect (Tr. 259). He found that Plaintiff's prognosis was "fair with treatment" (Tr. 260). He assigned her a GAF of 50[3] (Tr. 260).

The same month, Bina Shaw, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of mitral valve prolapse, anxiety, and lower back

---

[3]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *DSM–IV–TR* at 34.

pain resulting from her former husband's physical abuse (Tr. 261).  Dr. Shaw observed that Plaintiff's "problems [were] more mental than physical" and that "[s]he has been affected mentally by the abuse from her husband and loss of her job" (Tr. 261).  The range of motion studies were essentially normal  (Tr. 262).  Dr. Shaw found that Plaintiff could lift "at least 5 to 10 pounds . . . without difficulty" (Tr. 263).  Based on his examination, he found the presence of lower back pain, left hip pain, "possible right heel plantar fasciitis," and "mental illness" (Tr. 263).  An x-ray of the lumbar spine showed degenerative changes (Tr. 268).  In January, 2012 Tariq Mahmoud, M.D., a non-examining consultative source, opined that Plaintiff's mental impairments did not create work-related limitations (Tr. 64, 74).

### C.  The Vocational Testimony

VE Harrison stated that his testimony would be consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") and *Selected Characteristics of Occupations* (Tr. 53).  He classified Plaintiff's former work as a receptionist as sedentary[4] and semiskilled; manager of a travel agency, light/skilled; and administrative specialist, sedentary/skilled (Tr.  241).  He found that the former work had skills transferrable to the sedentary level including clerical jobs; "checking and recording, and communications;" and

---

[4]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

computer usage (Tr. 53). The ALJ then described a hypothetical individual of Plaintiff's age, education and work history:

> [A]ssume a . . . person individual . . . who can only lift or carry 10 pounds frequently and 20 pounds occasionally, who can stand or walk with normal breaks for a total of six hours in an eight-hour workday who could sit with normal breaks for a total of six hours in an eight-hour workday; who could perform pushing/pulling motions with her upper and lower extremities within those weight restrictions; and who could perform each of the following postural activities occasionally, climbing ramps and stairs, stooping, kneeling, crouching, or crawling; and who could perform work in a low stress work environment defined as having only occasional changes in the work setting (Tr. 54).

The VE testified that the restriction to "low stress work" would preclude all of Plaintiff's past relevant work or transferrable positions but would allow the hypothetical individual to perform the unskilled, exertionally light work of an electrical accessories assembler (3,000 jobs in the regional economy); fixture inspector (2,500); and hand packer (2,500) (Tr. 54-55). The VE testified further that if the hypothetical restriction to "low stress work" were omitted, the individual could perform all of Plaintiff's past work with transferrable skills additionally allowing for the semiskilled, light work of an order clerk (1,500) and general clerk (5,000) (Tr. 55). The VE testified that if the hypothetical restricted the individual to four hours standing or walking instead of six, the job numbers would remain the same (Tr. 57).

The VE testified that if the same individual were "off task" for 20 percent of the workday, or, was limited to sitting for two hours, standing one hour, and walking for one hour, all of the above jobs would be eliminated (Tr. 56).

**D.      The ALJ's Decision**

Citing the medical records, ALJ Neumann found that Plaintiff experienced the severe impairment of degenerative disc disease of the lumbar spine but that the condition did not meet or medically equal any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 17).  The ALJ declined to find a severe mental impairment, stating that while Plaintiff received mental health treatment in 2009, it did not meet the 12-month durational requirement (Tr. 19-20).  He rejected consultative examiner Dr. Hasan's finding of a depressive disorder on the basis that it was supported only by Plaintiff's subjective report (Tr. 20).  The ALJ cited Dr. Mahmoud's non-examining finding that Plaintiff did not experience a severe mental disorder (Tr. 20).  The ALJ noted that the imaging studies of the lumbar spine showed fairly unremarkable conditions (Tr. 21).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for exertionally light work limited by the ability to "only occasionally climb ramps and stairs, stoop, kneel, crouch, or crawl" (Tr. 18).  Citing the VE's testimony, the ALJ found that Plaintiff could perform her past relevant work as an administrative specialist and a marketing/project manager (Tr. 22).

The ALJ discounted Plaintiff's allegations of limitation (Tr. 18-19).  He noted that Plaintiff had a valid driver's license and was able to perform laundry and household chores without assistance (Tr. 18).  He cited Plaintiff's testimony that she was able to use a computer, read magazines, and volunteered at a senior center on holidays and weekends (Tr.

-10-

18).  The ALJ noted that although a family doctor had recommended "long term disability" as of 2002, Plaintiff continued to work until at least 2007 (Tr. 19).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.   It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).  The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

-11-

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS[5]

### A.  The Physical Impairments

Plaintiff argues first that the ALJ's finding that she is capable of light work is not supported by the medical transcript.  *Plaintiff's Brief* at 12-13, *Docket #12.*  She argues that her allegations of physical limitation are supported by Dr. Shukla's 2002 and 2003 disability opinions and the more recent treating and consultative records.  *Id.*

The ALJ did not err in finding that Plaintiff was capable of a limited range of light work.  Dr. Shukla's 2002 and 2003 disability opinions were created years before the alleged onset date of February 1, 2007 and have little bearing on her condition during the relevant period (Tr. 271-272, 269-270).  Moreover, it is uncertain from Dr. Shukla's statement that

---

[5]

In addition to the arguments discussed herein, Plaintiff makes an undeveloped contention that her 2007 work activity was an unsuccessful "work attempt" rather than substantial gainful activity.  *Plaintiff's Brief* at 12.  Unsuccessful work attempts, as defined by 20 C.F.R. § 404.1574(c), pertain to failed attempts to rejoin the work force after the alleged onset of disability.  The primary purpose of finding that work activity occurring after the alleged onset date was an "unsuccessful work attempt" rather than substantial gainful activity, "is to provide 'an equitable means of disregarding relatively brief work attempts' that do not demonstrate sustained substantial gainful activity."  *Hays v. Apfel*, 1999 WL 450902, *6 (D.Kan. May 10, 1999)(*citing* SSR 84–25, 1984 WL 49799, *3-4 (1984)).

Plaintiff's contention does not provide a basis for remand.  First, she does not state how long the "work attempt" lasted, how much she made, or the reasons the work was terminated.  The Court is thus unable to determine whether the activity was an unsuccessful work attempt (as defined by the Regulation) or substantial gainful activity.  Second, Plaintiff's argument is mooted by the fact that the ALJ acknowledged that she had not engaged in substantial gainful activity since the alleged onset date of February 1, 2007 (Tr. 17).

Plaintiff was disabled as a result of "chest pain, stress, and anxiety" whether the disability resulted primarily from physical or psychological conditions (Tr. 271-272). His 2003 records showing that Plaintiff had experienced "extreme weight loss," (unaccompanied by a medical explanation for the weight loss) suggest that the disability was due to "stress and anxiety," rather than a physical condition (Tr. 247, 269-270). The subsequent treating records do not support Plaintiff's claim that the mitral valve condition would preclude light work.

Dr. Shaw's December, 2011 consultative physical examination findings likewise support an RFC for light work. He noted a normal range of motion, a normal gait, and full muscle strength in all extremities (Tr. 362-362). He noted that Plaintiff could get off a table and out of chair without difficulty (Tr. 263). The x-ray of the lumbar spine showing degenerative changes but no other abnormalities also supports the finding that Plaintiff was capable of exertionally light work (Tr. 268). While the ALJ's finding that Plaintiff could lift 20 pounds occasionally and 10 frequently appears to differ from Dr. Shaw's finding that Plaintiff could lift 10 pounds (Tr. 18, 263), the ALJ supported the RFC by noting that Plaintiff was able to care for several cats, perform laundry chores, and drive (Tr. 21). He observed that Plaintiff did not appear to be "in any obvious pain discomfort" walking into the hearing room, during her testimony, or leaving (Tr. 21).

For these reasons, the ALJ's conclusion that Plaintiff was physically capable of performing exertionally light work should remain undisturbed.

## B. The Mental Impairments

In contrast, the ALJ's finding that Plaintiff's psychological problems did not create even *de minimis* work-related limitations is not supported by the medical transcript. At Step Two, the ALJ found the severe impairment of degenerative disc disease of the lumbar spine, but determined that Plaintiff did not experience any significant psychological impairment (Tr. 17). In support of this finding, the ALJ cited Dr. Mahmoud's January, 2012 finding that Plaintiff's mental conditions were non-severe (Tr. 64).

"[T]he second stage severity inquiry, properly interpreted, serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Secretary of HHS*, 773 F.2d 85, 89 (6th Cir.1985). An impairment can be considered "not severe ... only if the impairment is a 'slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience.' " *Id.,* 773 F.2d at 90 (*citing Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir.1984)). A non-severe impairment is defined as one that does not "significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The same regulation defines "basic work activities" as "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." § 404.1521(b).

-15-

However, the medical transcript overwhelmingly supports the finding that Plaintiff's mental conditions created more than *de minimis* limitations. Plaintiff's long-standing family physician noted repeatedly from March, 2002 forward that Plaintiff experienced "stress" and "anxiety" (Tr. 270-276). Her "extreme weight loss," as noted by the records, does not appear to be attributable to a physical ailment, but rather, her psychological state (Tr. 247). While the ALJ acknowledged the February, 2009 involuntary psychiatric hospitalization records (Tr. 19), he found that the mental conditions did not meet the 12-month durational requirement for a "severe" impairment.

However, the records contain a plethora of evidence showing that Plaintiff's mental conditions lasted longer than 12 months. In November, 2004, Dr. Naber noted the conditions of stress and anxiety (Tr. 284). Likewise, his September, 2006 treating records state that she experienced "increased anxiety" (Tr. 251, 283) and in January, 2009, was "under stress" and "depression" (Tr. 249). Inpatient notes from the next month state that family members noticed that she had been behaving strangely for several years and that her former husband had taken out a restraining order against her (Tr. 436). The same month, Dr. Nabors noted a "*long history* of anxiety with exacerbation of same causing hospitalization" (Tr. 431)(emphasis added).

In support of his contention that Plaintiff did not experience mental health problems after 2009, the ALJ cited Dr. Naber's April, 2012 letter stating that he was discontinuing the treating relationship because Plaintiff had called the office "a number of times" but had not

made any appointments (Tr. 19). However, Dr. Naber's letter suggests that Plaintiff was being discharged for frequent and inappropriate "nuisance" calls to office staff rather than a simple failure to follow through with treatment (Tr. 301). Likewise, 2009 treatment records stating that Plaintiff's former husband had obtained a personal protection order against her long before the 2009 hospitalization, and police statements that she made numerous and unnecessary calls to 911 also suggest ongoing psychological problems (Tr. 313, 321-322, 436).

The ALJ also cites Dr. Lawrence's February, 2013 letter stating that she had not treated Plaintiff since 2009 for the conclusion that Plaintiff did not experience psychological problems for 12 months (Tr. 19-20). However, Dr. Lawrence's letter does not suggest that Plaintiff's mental problems were restricted to less than 12 months. Dr. Lawrence, noting her the treating records were destroyed, states that the clinic where Plaintiff received treatment was closed after the 2009 death of the owner (Tr. 301). She notes further that she "had not seen [Plaintiff] for a long time prior to [the owner's] death" (Tr. 301). Assuming that the clinic was closed shortly after its owner's death, it is possible that Dr. Lawrence's treating relationship predated as well as post-dated the February, 2009 hospitalization (Tr. 301). Given Dr. Lawrence's statement that she had not treated Plaintiff for "a long time" prior to the owner's death, the ALJ's assumption that Plaintiff's treatment was limited to the period after the February, 2009 hospitalization and the 2009 death of the clinic's owner is unfounded.

-17-

Moreover, Dr. Lawrence's recollection of the treating relationship includes her parting recommendation to Plaintiff to get a "complete and thorough psychological exam" by a psychiatrist (Tr. 301).  Dr. Lawrence's conclusion that Plaintiff had significant mental problems requiring a psychiatric evaluation implies some level of impairment (Tr. 301).  Dr. Lawrence, noting that she had reestablished contact with Plaintiff in 2013, stated that at present, she felt "strongly" that Plaintiff required a psychiatric evaluation (Tr. 301).  An attached February, 2013 "Patient Information" sheet, completed by Plaintiff, claims that she had been a "victim of multi-crimes" including "theft," "stalking victim," "discrimination and harassment," and domestic violence (by family and former husband) as well as "wrongful denial of bus service (discrimination)," "wrongful denial [of medical] services," denial of her civil rights, and "wrongful incarceration" (Tr. 302).  Plaintiff's 2013 statement that she believed that she had been harassed by individuals, medical care providers, and law enforcement officials is consistent with February, 2009 inpatient psychiatric records showing that she experienced "persecutory" delusions and anxiety (Tr. 306, 312).

While the ALJ found that the failure to seek mental health treatment after 2009 undermined the claim of ongoing mental problems (Tr. 20), the evidence in this case suggests that failure to obtain treatment or even acknowledge significant psychological difficulties was in fact a symptom of the condition.  "ALJs are cautioned to closely look to the entire record in cases concerning a lack of treatment for mental disorders because the Courts have recognized that mental health disorders may in fact create symptoms that cause the very

-18-

failure to seek treatment itself." *Morris v. Commissioner of Social Security*, 2015 WL 7450150, *6 (E.D.Mich. November 25, 2015)(Tarnow, J.)(*citing White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 283-84 (6th Cir. 2009)).  "Therefore, when taking into consideration failure to seek treatment, ALJs are required to consider the evidence in record and see if a 'reasonable mind' could find that the lack of treatment was related to the disorder itself or could indicate a possible alleviation of symptoms which should be taken into account in the credibility analysis." *Id.*  Plaintiff's February, 2013 belief that her anxiety was due to "persecution" by various individuals and organizations (as opposed to ongoing mental condition) suggests that her failure to seek long-term mental treatment between 2009 and 2013 was "related to the disorder itself" rather than an improvement in her condition.  *Id.*

Further, given the lack of mental health treatment records, the more recent consultative observations take on greater significance.  As of December, 2011 Dr. Hasan found that Plaintiff was "isolated and withdrawn," assigning her a GAF of 50 which suggests among other things, difficulty "keeping a job" (Tr. 260); *DSM-IV-TR,* 34.  Most remarkably, Dr. Shaw's consultative *physical* findings based on his examination from the same month include his unsolicited  observation that Plaintiff suffered from "mental illness" (Tr. 261-263).  Despite the fact that both consultative examiners observed signs of mental illness, the ALJ adopted Dr. Mahmoud's non-examining finding that the lack of long-term mental health treating records supported the finding that her psychological conditions were not severe (Tr. 20, 64).

-19-

While the ALJ would ordinarily be entitled to adopt the non-examining findings and reject the examining ones, his reliance on Dr. Mahmoud's "non-severe" findings is problematic. Dr. Mahmoud's findings predate Dr. Lawrence's February, 2013 letter stating that (1) Plaintiff received mental health treatment either in period predating and/or postdating the February, 2009 inpatient treatment, (2) Dr. Lawrence believed that Plaintiff required additional mental health evaluation at the time the former treatment was terminated and, (3) as of February, 2013, Dr. Lawrence believed that Plaintiff required additional treatment. Further, Dr. Mahmoud did not have benefit of the "Patient Information" sheet from the same month, suggesting that Plaintiff still suffered from the delusions of persecution that led to her February, 2009 hospitalization. Dr. Lawrence's February, 2013 submission showing that Plaintiff had received treatment in the past and was in need of current treatment undermines Dr. Mahmoud's January, 2012 finding that the mental impairments were "non-severe" or did not meet the 12-month durational requirement. *See Hamblin v. Apfel*, 7 Fed.Appx. 449, 451, 2001 WL 345798, *2 (6th Cir. March 26, 2001) (updated findings generally entitled to greater weight than older ones).

Aside from the ALJ's questionable reliance on the non-examining source, his summation of Plaintiff's regular activities contains error. While he supported his finding that Plaintiff did not experience significant mental limitations by noting (erroneously) that she was able to take care of six cats (Tr. 20-21), she testified that at the time of the hearing that she was living alone with not six, *but 14 cats* (Tr. 33). The fact that Plaintiff had taken on

-20-

the care of 14 cats in her single-family home does not so much suggest that she was capable of maintaining a routine or taking care of her responsibilities as it implies a lack of good judgment.

To be sure, the omission of an impairment causing work-related limitations at Step Two is of "little consequence," provided that the ALJ considers "all impairments" in crafting the RFC. *Pompa v. Commissioner of Social Sec.*, 73 Fed.Appx. 801, 803, 2003 WL 21949797, * 1 (6th Cir. August 11, 2003). However, here, the RFC contains no reference to psychological limitation. The vocational testimony spotlights the import of this omission: The ALJ's original hypothetical question to the VE included a restriction to a limited range of light work and the modifier "low stress," with "only occasional changes in the work setting," apparently in acknowledgment of the alleged psychological limitations (Tr. 54). In response, the VE found that the restriction to low stress work would limit the individual to unskilled work (Tr. 54-55). As the ALJ was aware, an individual 55 or over (advanced age) and limited to exertionally light, unskilled work, would result in a finding of disability. 20 C.F.R. Pt. 404, Subpt. P, App. 2., Rule 202.06. Further, given Plaintiff's "borderline" age of 54 years and 10 months at the time of the administrative decision, the ALJ could have found that Plaintiff was of "advanced age" for purposes of the disability determination. *Crady v. Secretary of Health & Human Services,* 835 F.2d 617, 622 (6th Cir.1987). In any case, the restriction to "low stress" and thus, unskilled work would have resulted in a finding of disability as of Plaintiff's 55th birthday.

Instead, the ALJ "walked back" the original hypothetical and posed a second question omitting the "low stress" restriction after hearing that the "low stress" modifier would preclude all skilled and semiskilled work. In response to a second hypothetical omitting the term "low stress," the VE found that the hypothetical individual could perform all Plaintiff's past relevant work (Tr. 55). In contrast to a finding that she was limited to unskilled work, the finding that Plaintiff could perform her past relevant work or work using transferrable skills would result in a non-disability finding. 20 C.F.R. Pt. 404, Subpt. P, App. 2., Rule 202.08.

It is well established that a VE's job findings constitute substantial evidence so long as they are given in response to a hypothetical question accounting for all of a claimant's relevant restrictions; *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987); *Ealy v. Commissioner,* 594 F.3d 504, 516 (6th Cir.2010). While the ALJ is not obliged to include discredited allegations among the hypothetical modifiers, *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118–119 (6th Cir.1994), the transcript as a whole overwhelmingly supports the finding that Plaintiff, at a minimum, experienced some degree of psychological limitation lasting over 12 months. The ALJ's finding that Plaintiff did not experience any significant degree of ongoing psychological limitations is not within the "zone of choice" accorded the administrative fact-finder, but rather, a myopic, if not wholly distorted interpretation of the record.

While a remand to the administrative level is warranted for the above-discussed reasons, I decline to recommend a remand for an award of benefits. A remand for an award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.,* 17 F.3d 171, 176 (6th Cir.1994). While the errors discussed herein strongly support a remand, a remand for benefits prior to the resolution of the unresolved factual issues would be premature. As such, I recommend a remand for further administrative proceedings consistent with this Report.

## CONCLUSION

For the reasons stated above, I recommend that Plaintiff's motion [Doc. #12] be GRANTED to the extent that the case is remanded for further administrative proceedings and that Defendant's motion for summary judgment [Doc. #13] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

-23-

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

      Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than 20 pages in length

unless by motion and order such page limit is extended by the court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.


               s/R. Steven Whalen                 
               R. STEVEN WHALEN
               UNITED STATES MAGISTRATE JUDGE

Date: February 25, 2016


<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on
February 25, 2016, electronically and/or by U.S. mail.

               s/C. Ciesla                     
               Case Manager

-24-